UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Worcester Division)

| | |
|---|---|
| JOSEPH LIJOI, : | |
|     Plaintiff : | |
| : | |
| v. : | C.A. No. 2021- |
| : | JURY TRIAL DEMANDED |
| TOWN OF LEICESTER, by and Through : | |
| Its Treasurer, Melanie Jackson; : | |
| LEICESTER PUBLIC SCHOOLS, : | |
| by and Through Its Superintendent, : | |
| Marilyn Tencza; : | |
| MARILYN TENCZA; and : | |
| CHRISTOPHER FONTAINE, : | |
|     Defendants. : | |

**VERIFIED COMPLAINT**

Plaintiff Joseph Lijoi hereby commences this action against his employers the Town of Leicester, the Leicester Public Schools and their agents for violations of 42 U.S.C. § 1983. Lijoi alleges the following:

**The Parties**

1. Plaintiff JOSEPH LIJOI ("Lijoi") is an individual, male person of legal age, who, at all times relevant to this action, was employed by Leicester Public Schools. At all times relevant to this action, Lijoi was a "teacher" within the meaning of Mass. Gen. Laws c. 71 § 42 and a "citizen of the United States" within the meaning of 42 U.S.C. § 1983.

2. Defendant TOWN OF LEICESTER is a municipal corporation organized under the laws of the Commonwealth of Massachusetts and is being sued by and through its Treasurer Melanie Jackson. At all times relevant to this action, Defendant Town of Leicester served as Lijoi's employer and controlled the terms and conditions of his employment. At all times relevant to this action, Defendant Town of Leicester maintained a principal place of business at 3 Washburn Sq., Leicester, MA 01524. At all times relevant to this action, Defendant Town of Leicester was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983.

3. Defendant LEICESTER PUBLIC SCHOOLS is a public school system organized under the laws of the Commonwealth of Massachusetts and is authorized by the Massachusetts Board of Education to provide educational instruction and services to students residing in and around Leicester, Massachusetts and is being sued by and through its Superintendent Marilyn Tencza. At all times relevant to this action, Defendant Leicester Public Schools maintained a principal place of business at 3 Washburn Sq., Leicester, MA 01524 and served as Lijoi's employer, controlling the terms and conditions of his employment. At all times relevant to this action, Defendant Leicester Public Schools was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983.

4.  Defendant Marilyn Tencza ("Tencza") is an individual, female person of legal age, who, at all times relevant to this action, was an employee of Defendant Town of Leicester and served as Superintendent of Leicester Public Schools. At all times relevant to this action, Defendant Tencza exercised control over the terms and conditions of Lijoi's employment and had the sole authority to terminate Lijoi's employment without the need for approval from the Leicester School Committee. At all times relevant to this action, Defendant Tencza was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983 and is named as a defendant in this action, individually, and in her official capacity as the Superintendent of Leicester Public Schools, who actively participated in, and stands individually liable for, the unconstitutional, wrongful, tortious and negligent acts, errors and omissions complained of herein.

5.  Defendant Christopher Fontaine ("Fontaine") is an individual, male person of legal age, who, at all times relevant to this action, was an employee of Defendant Town of Leicester and Lijoi's immediate supervisor. At all times relevant to this action, Fontaine exercised control over the terms and conditions of Lijoi's employment and had the authority to terminate his Lijoi's employment subject to the approval of the Superintendent. At all times relevant to this action, Fontaine was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983 and is named as a defendant in this action, individually, who actively participated in, and stands individually liable for the unconstitutional, wrongful, tortious and negligent acts, errors and omissions complained of herein.

## 1.
## Jurisdiction and Venue

6.  The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983.

7.  This Court's exercise of supplemental jurisdiction with respect to Plaintiff's state law claims is warranted because they are so related to Plaintiff's federal claim that they form part of the same case or controversy.

8.  Venue is in invoked pursuant to 42 U.S.C. § 1983. Venue is proper in this Court because each Defendant maintains a principal place of business in the Commonwealth of Massachusetts.

9.  Personal jurisdiction exists over the Defendants in that they maintain sufficient minimal contacts in the Commonwealth of Massachusetts. Specifically, Defendants engage in systematic and continuous activity in the Commonwealth of Massachusetts. Moreover, the actions complained of herein occurred in the Commonwealth of Massachusetts.

## Factual Allegations

10. Lijoi is a fifty-five year old, Caucasian male.

11. Lijoi worked for the Leicester Public Schools (sometimes referred to as the "School District") as a 6th grade math teacher from August 28, 2006 to August 18, 2020, at which he terminated for "conduct unbecoming" pursuant to Mass. Gen. Laws c. 71, § 42.

12. In 2006, Lijoi began working for the Leicester Public Schools at the Leicester Middle School.

13. Lijoi taught math exclusively to all three grades at the middle school.

14. At the time of his termination, Lijoi was supervised by the Principal of the Leicester Middle School, Defendant Fontaine.

**Facebook**

15. Facebook is a social media platform with more than 2.85 billion active users worldwide, including some 190 million in the United States. The platform allows users to publish messages, publish media, share what other users publish, and interact with published messages and other users. Speech published on Facebook covers a wide range and variety of topics, but particularly relevant here is that a significant amount of speech posted on the platform is speech by, to, or about political topics: race, racism, and white privilege.

16. A Facebook "user" is an individual who has created an account on the platform. A user can publish text, media, links, or any combination of the three through the user's "profile" onto their "timeline." A user can also post in "groups" or onto "pages." Some Facebook users rarely or never post, while others post hundreds of times a day.

17. A Facebook user's profile is the single website associated with the user. This profile contains a "timeline" which may or may not contain posts. The profile also may contain information about the user. Users can add one another as "friends" through their profiles.

18. A Facebook page is similar to a profile, but is differentiated by its ownership, content, and interaction capabilities. While a user can register only a single profile per account they maintain, multiple pages can be created and operated by a single user. Additionally, pages can be operated collaboratively by multiple users with varying levels of access. A user cannot request to be friends with a page, but rather can "like" or "follow" the page.

19. A timeline is the display of posts generated by either a profile or a page, with the most recent posts appearing at the top of the timeline. When a user posts generally, in this instance meaning not into a group, whether through their profile or a page to which they have access, the post automatically appears on the corresponding timeline.

20. A Facebook user can be friends with other users, which can provide greater access to information if the user they friend has a private or partially restricted account. Users can also follow both profiles and pages to get updates in their "feed" whenever the profile/page posts.

21. A Facebook user can interact with posts from profiles and pages either by sharing, commenting on, or reacting to the post. Sharing a post allows a user to republish a post into their own timeline and allows the user to add their own text on top of the republished post. Commenting on a post allows a user to respond to it with text, media, or a link and comments can be published as a reply to the original post or another comment on that post. Reacting to the post allows a user to respond with typically one of 7 emojis. Reactions include the like reaction and took the place of Facebook's original like feature.

22. By default, Facebook profiles and their associated timelines are visible to the public, even those without a Facebook account. However, non-users cannot interact with posts. Additionally, Facebook users can restrict visibility of portions of their profile through their privacy settings.

23. When commenting in response to a comment, a Facebook user's comment will appear nested below the comment it is in response to. All comments will be nested under the comment they are replying to creating a comment thread. However, users can tag others by their profile or page name in their comment and this will act as a reply without creating a nested comment thread. Both replying and commenting while tagging a user will send them a notification.

24. Posts, comments, reactions, and shares are controlled by the user who generates them. No other Facebook user can alter the content of any post, comment, or reaction, either before or after it is posted. Facebook users cannot prescreen posts, comments, reactions, or shares that reference their posts or accounts.

25. A Facebook user can block another user which restricts them from writing on their timeline, tagging them in comments or posts, sending them an invite, or trying to friend them. It also restricts the visibility of content from one user to another. Facebook users can only block pages and profiles from their own profile, therefore pages cannot block users regardless of their operator's profile's blockings or settings.

26. A Facebook user operating a page can ban another user from that page. While this does not restrict the banned user from viewing the page and its content, it fully restricts the user from interacting with the page. A fully banned user cannot react to posts, react to comments, comment on posts, or comment in reply to other comments. The banned user is essentially fully barred from interacting or engaging with any content on the page or any content replying to the page and is unable to participate in any discourse held on the page

**Lijoi's June 2020 Facebook posts on the Black Lives Matter movement and racism in the United States**

27. During the middle of the 2019-2020 school year, Leicester Public School students began attending school remotely due to the COVID-19 pandemic.

28. In June 2020, Lijoi spent his leisure time listening to sports radio and engaging in Facebook dialogue on his personal Facebook account: "Joseph Richard Lijoi."

29. At the time, Lijoi had approximately 100 to 150 Facebook friends including a few of his colleagues from school.

30. Lijoi set his Facebook settings to "private" to permit only his Facebook friends to view his posts and not other Facebook members or members of the general public.

31. Lijoi's Facebook page made no reference to his occupation as a school teacher or his employment with the Leicester Public Schools.

32. In June 2020, the BLM movement had become prominent due to the police killing of George Floyd on May 25, 2020.

33. Lijoi often listened to sports radio talks shows. During this time, the sport talk shows focused primarily on the BLM movement and racism in the country since there was little sports to talk about due to the pandemic.

34. A popular and controversial topic on sports radio was NFL football player Colin Kaepernick's decision to kneel during the playing of the National Anthem at NFL games.

35. In early June 2020, Lijoi made several posts on his Facebook page, discussing with his Facebook friends racism in the United States. On June 2, 2020, Lijoi's posted:



(the "June 2, 2020 Facebook Post").

36. On June 6, 2020, Lijoi posted:



(the "June 6, 2020 Facebook Post").

37. On June 10, 2020, Lijoi posted in response to another friend's post:



(the "June 10, 2020 Facebook Post").

38. The last day of the 2019-2020 academic school year was June 16, 2020.

39. On or about June 23, 2020, one week after the 2019-2020 school year had ended, Lijoi made two political posts on his Facebook page concerning racism and white privilege in the United States (collectively the "June 23, 2020 Facebook posts").

40. The first post cited an essay written by Vincent Harinam and Rob Henderson, Ph.D. students at the University of Cambridge, entitled, "Why White Privilege is Wrong – Part 1," published on an online academic website called Quillette on August 22, 2019.

41. The authors' premise of the essay is that there are other non-white groups such as Asians and Nigerians that have higher incomes than whites and, therefore, it is inaccurate to claim that white are the most privileged group in the country.

42. Lijoi posted:



43. In the second Facebook post, Lijoi states that outward acts of racism in this country are no longer as prevalent as they used to be when he was younger as evidence by recent claims of racism by actor Jussie Smollett and NASCAR driver Bubba Wallace that turned out to be untrue (the "Second Facebook").  Lijoi posted:



44. None of Lijoi's Facebook friends posted any negative comments on the June 23, 2020 Facebook posts.

45. Lijoi made the June 23, 2020 Facebook posts as a private person outside of the workplace.

46. The June 23, 2020 Facebook posts did not reference any matters pertaining to Lijoi's workplace, his position as a school teacher, the Leicester Public Schools or the Town of Leicester.

47. The June 23, 2020 Facebook posts concerned matters of a public concern — racism and white privilege in the United States.

48. Lijoi took down the June 23, 2020 Facebook posts after one day when his mother called him and advised him to do so.

49. On June 25, 2020, Defendant Fontaine, the Principal of the Leicester Middle School and Lijoi's immediate supervisor, learned about the June 23, 2020 Facebook posts from a Leicester teacher who texted him screen-shots of the two posts with the message: "You need to take a look at this" or words to that effect.

50. On June 30, 2020, Defendant Fontaine held a meeting with Lijoi and two representatives from Jijoi's union (the "June 30, 2020 meeting").

51. At the June 30, 2020 meeting, Defendant Fontaine informed Lijoi that he had received screenshots of the two Facebook posts from a staff member of the Leicester Public Schools.

52. Lijoi confirmed that he made the June 23, 2020 Facebook posts.

53. Defendant Fontaine never asked Lijoi to explain why he made the June 23, 2020 Facebook posts or to provide any context or clarification.

54. Defendant Fontaine refused to identify the teacher who sent him the screen shots despite Lijoi repeated requests.

55. On July 8, 2020, Defendant Fontaine issued a letter to Lijoi notifying him of his intent to terminate his employment for "conduct unbecoming a teacher" pursuant to Mass. Gen. Laws c. 71, § 42 (the "Notice of Intent to Dismiss Letter"). The Notice of Intent to Dismiss Letter provided in relevant part:

> **I learned of two Facebook posts you made in June (that you admitted you posted) which are inconsistent with important principles of respecting diversity and acknowledging issues known to be associated with black persons' struggles, and promoting equality and justice for all individuals. Your messages deny that racism exists in our community and beyond, and they perpetuate a myth that is not healthy for our students and school community, as we have no way of really knowing who among them have read your posts. In short, they are hurtful, race-based rants that have no place in our School District.**

> **In addition to your Facebook posts, I have also considered your prior discipline record, which includes but is not limited to a five-day unpaid suspension in June 2019 for unprofessional communications with a parent. As you know, in addition to the suspension you served, you were required to satisfy additional conditions that included your participation in and proof of counseling. You specifically stated last year that you needed help, so you were given the opportunity to attend counseling to address your self- control/ anger issues. Your recent Facebook postings show you continue to struggle with self composure. In short, your recent and prior conduct is unacceptable for a professional educator and not in the best interests of our students (and staff) to be exposed to.**
>
> **Pursuant to M.G.L. Chapter 71, Section 42, you have the right to meet with me to review this intended action within ten (10) business days of receiving this written notice. At the meeting, you may present information pertaining to the basis for my decision and your status as a teacher in the School District. You also have the right to be represented at that meeting by an attorney or other representative.**

56. Importantly, Lijoi never wrote in either of the June 23, 2020 Facebook posts that racism does not exist and, therefore, Defendant Fontaine's statement: "Your messages deny that racism exists in our community and beyond" is false.

57. At the time, Defendant Fontaine issued the Notice of Intent to Dismiss letter to Lijoi, he had not read the contents of the essay entitled: "White Privilege is Wrong – Part I." — the link that Lijoi posted on his Facebook, but rather, Defendant Fontaine simply based his decision to terminate Lijoi on the caption Lijoi posted.

58. At the time Lijoi made the June 23, 2020 Facebook posts, Leicester Public Schools did not have in place a social-media policy for its employees to follow.

### The School District holds a *Loudermill* hearing on Lijoi's termination.

59. On July 28, 2020, the School District held a *Loudermill* hearing on Lijoi's termination where he was represented by an attorney appointed his union.

60. Lijoi's union lawyer argued that Lijoi's posts were not racist and that they were merely an expression of his political views on racism, which are protected by the First Amendment.

61. Importantly, Lijoi's union lawyer presented documentation of three anti-racist Facebook posts Lijoi made on June 2, 2020, June 6, 2020, and June 10, 2020, two to three weeks prior to the Facebook posts for which he was ultimately fired, that were unambiguously, anti-racist, sympathetic to the challenges that blacks faces in this country, and supportive of the Black Lives Matter movement.

62. In the June 2, 2020 Facebook post, Lijoi admits that he was wrong about criticizing football player Colin Kaepernick for kneeling during the National Anthem at NFL football games. Lijoi wrote:   Lijoi even wrote: "And, yes.  Black Lives Matter."

63. Nonetheless, Defendant Fontaine was unpersuaded by this new evidence, and he refused to rescind Lijoi's termination.

### **The Leicester Public Schools terminates Lijoi's employment for conduct unbecoming a teacher.**

64. On August 18, 2020, Defendant Fontaine notified Lijoi by letter that it was terminating his employment for "conduct unbecoming a teacher" pursuant to Mass. Gen. Laws c. 71, § 42 (the "Termination Letter").

65. Defendant Fontaine authored and signed the Termination Letter.

66. Defendant Tencza approved Lijoi's termination by sign the Termination Letter under where it was written:  "Approved by Marilyn Tencza, Superintendent of Leicester Public Schools."

67. The termination letter provided in pertinent part:

> **I continue to believe as I did when I first brought this issue to your attention, that your June 2020 Facebook post is hurtful to black persons <u>as it denies racism exists in our community and beyond</u>.  It denies the struggles and lack of equality and injustice black persons experience even today. It is an offensive message that does not respect our black community members and therefore it is not the type of commentary representative of the values we should be sharing with our students in school community. Further, I am not persuaded that your post is part of a conversation with Facebook friends that has led you to insights and understanding about racism in our country and the better appreciation of the hardship black persons endure (emphasis added).**

68. Again, Defendant Fontaine wrote:  "Your messages deny that racism exists in our community and beyond," which is false because Lijoi never stated that racism does not exist in this country.

69. On August 18, 2020, pursuant to Mass. Gen. Laws c. 71, § 42, Lijoi filed timely a Petition for Arbitration with the Commissioner for the Massachusetts Department of Elementary and Secondary Education.

70. On September 23, 2020, Lijoi's union voted against supporting his arbitration case, and he was forced to hire a private attorney and bear the cost of the arbitration including the cost of the hearing transcripts.

71. On March 4, 2021 and March 24, 2021, arbitration hearings were held remotely before Arbitrator Sheila Mayberry, Esq.

72. Each party submitted exhibits into evidence. The School District presented Defendant Fontaine as its only witness, and Lijoi presented himself as his only witness.

73. Defendant Fontaine testified that Lijoi was fired because his Facebook posts were "hurtful and offensive to students of color" and, thus, they created an "unsafe learning environment" for students at the Leicester Middle School.

74. Defendant Fontaine testified that his decision to fire Lijoi was approved by Defendant Tencza, who signed the Termination Letter in her capacity as Superintendent of Leicester Public Schools.

75. In Massachusetts, superintendents of public schools have the sole authority to fire teachers without the need for approval by the School Committee or any other committee within the town.

76. Incredibly, Defendant Fontaine testified that Lijoi's employment would not have been terminated had Lijoi not made the June 23, 2020 Facebook posts. Fontaine testified:

> **Q.  Had Mr. Lijoi not made the Facebook posts, he would not have been terminated, correct?**
> **A.  No, he would not have been.**

77. Defendant Fontaine testified that no teachers who worked in the Leicester Public Schools ever complained to him or the Town of Leicester about the June 23, 2020 Facebook posts.

78. Defendant Fontaine testified that no parents of any Leicester Public School student ever complained to him or the Town of Leicester about the June 23, 2020 Facebook posts.

79. Defendant Fontaine testified that no students at the Leicester Middle School ever complained to him or the Town of Leicester about the June 23, 2020 Facebook posts.

80. On June 21, 2021, Arbitrator Mayberry issued a Decision and Award holding that Lijoi's termination violated Mass. Gen. Laws c. 71, § 42 and ordered Defendant Leicester Public Schools to reinstate Lijoi to his employment with full back pay less interim earning including unemployment compensation received.

81. However, as a result of the union's refusal to provide Lijoi with representation at arbitration, he incurred $52,440 in arbitration costs: (1) $45,313 for attorneys' fees; (2) $4,848 for the arbitrator's fee; and (3) $2,279 for the hearing transcripts.

82. On August 3, 2021, the School District notified Lijoi that it had eliminated a middle school math teacher position at the end of the 2020-2021 academic school year and that based on his seniority, it did not have a math teacher position available for him at the middle school.

83. The August 3, 2021 letter also informed Lijoi that based on his seniority and bumping rights, it had no other teacher position available for him within the school district.

84. However, Matthew Joseph, the former Director of Curriculum and Instruction for Defendant Leicester Public Schools, claims that Defendant Fontaine told him that he and Defendant Tencza made the decision to eliminate Lijoi's position "in case Joe Lijoi wins his arbitration. He would have bumping rights to whomever we put in that position if we don't cut one position."

85. Defendants' actionable conduct complained of herein proximately caused Lijoi to suffer severe economic losses including lost wages and benefits, substantial out-of-pocket expenses, attorneys' fees and costs, grave and substantial compensatory damages, including personal emotional pain, personal suffering, personal inconvenience and discomfort, mental anguish, extreme and severe emotional distress, loss of enjoyment of life, humiliation, embarrassment, fear and discomfort triggered by suffering a damage to her reputation, anguish, frustration, and other severe non-pecuniary losses, now, and in the future, as well as future pecuniary losses.

## CLAIMS AGAINST DEFENDANTS TOWN OF LEICESTER AND LEICESTER PUBLIC SCHOOLS

### COUNT I
### VIOLATION OF 42 U.S.C. § 1983
### FIRST AMENDMENT RETALIATION — TERMINATION

86. Plaintiff hereby incorporates by reference paragraphs 1-85 of this Complaint as though fully set forth herein.

87. At all relevant times to this matter, Lijoi was employed by a public employer.

88. On June 23, 2020, Lijoi made two Facebook posts concerning matters of a public concern — race and racism.

89. Lijoi made the June 23, 2020 Facebook posts as a private person outside of the workplace.

90. In his June 23, 2020 Facebook posts, Lijoi did not reference any matters pertaining to his workplace, supervisors or co-workers.

91. In his June 23, 2020 Facebook posts, Lijoi did not reference any matters pertaining to his position as a school teacher, Leicester Public Schools or the Town of Leicester.

92. By making the June 23, 2020 Facebook posts, Lijoi was speaking as a citizen on matters of public concern.

93. No teachers who worked for Leicester Public Schools ever complained to the School District about the June 23, 2020 Facebook posts.

94. No parents of any student in the Leicester Public Schools ever complained to the School District about the June 23, 2020 Facebook posts.

95. No students at the Leicester Middle School ever complained to the School District about the June 23, 2020 Facebook posts.

96. Because there were no complaints by any teachers, parents, or students about the June 23, 2020 Facebook posts in which Lijoi commented upon matters of public concern, the efficiency of the public services the Town of Leicester performs through its employees — providing educational instruction to public-school students — was not disrupted in any way.

97. Accordingly, Lijoi's speech outweighed any interest that Defendants had in preventing unnecessary disruptions and inefficiencies in the workplace and, therefore, Defendants did not have an adequate justification for terminating Lijoi.

98. Lijoi's June 23, 2020 Facebook posts are political speech protected under the First Amendment to the United States Constitution.

99. When Defendants terminated Lijoi, they was acting under the color of law within the meaning of 42 U.S.C. § 1983.

100. Lijoi's speech was a substantial or motivating factor in Defendants decision to terminate him because Defendant Fontaine testified under oath that had Lijoi not made the June 23, 2020 Facebook posts, he would not have been terminated.

101. Furthermore, under the Massachusetts Education Reform Act of 1993, the ultimate responsibility for hiring, firing, and demoting public-school teachers resides with the superintendents.

102. And because Lijoi's injury was caused by a person with final policymaking authority – Defendant Tencza, who was the Superintendent of the Leicester Public Schools at the time – the unconstitutional conduct occurred pursuant to an official policy or custom and, therefore, Defendants are liable.

103. Defendants conduct as described herein constitutes a violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiff has been harmed thereby.

## COUNT II
## VIOLATION OF 42 U.S.C. § 1983
## FIRST AMENDMENT RETALIATION — JOB ELIMINATION

104. Plaintiff hereby incorporates by reference paragraphs 1-103 of this Complaint as though fully set forth herein.

105. On March 4, 2021 and March 24, 2021, arbitration hearings were held.

106. At arbitration, Defendants presented no evidence that Lijoi had engaged in conduct unbecoming a teacher that could support a termination under the law.

107. Defendants presented no evidence that any teachers, parents or students complained about the June 23, 2020 Facebook posts.

108. After the hearing were completed, it was clear and obvious that Lijoi would prevail on his arbitration claim and be reinstated to his position.

109. The arbitrator notified the parties that a decision would issue no later than June 21, 2021 (the "arbitration deadline").

110. Prior to the end of the academic school year in May 2021, but before the June 21, 2021 arbitration deadline, Defendants abruptly and without justification eliminated Lijoi's position.

111. On August 3, 2021, six weeks after the arbitrator's decision, Defendants notified Lijoi by letter that they had eliminated a middle school math teacher position at the end of the 2020-2021 academic school year and that based on his seniority, there was no math teacher position available for him at the middle school.

112. The August 3, 2021 letter also informed Lijoi that based on his seniority and bumping rights, there were no other teacher positions available for him within the School District.

113. However, Matthew Joseph, the former Director of Curriculum and Instruction for Defendant Leicester Public Schools, claims that Defendant Fontaine told him that he and Defendant Tencza made the decision to eliminate Lijoi's position "in case Joe Lijoi wins his arbitration. He would have bumping rights to whomever we put in that position if we don't cut one position."

114. Thus, it is clear that Lijoi's political speech was a substantial or motivating factor in Defendants decision to eliminate his position.

115. And because Lijoi's injury was caused by a person with final policymaking authority – Defendant Tencza, who was the Superintendent at the time – the unconstitutional conduct occurred pursuant to an official policy or custom and, therefore, Defendants are liable.

WHEREFORE, Plaintiff has been harmed thereby.

## COUNT III
## DEFAMATION

116. Plaintiff hereby incorporates by reference paragraphs 1-115 of this Complaint as though fully set forth herein.

117. On July 8, 2020, Defendant Fontaine issued to Lijoi a Notice of Intent to Dismiss letter in which he accused Lijoi of denying that racism exists in the Leicester community and beyond.

118. Importantly, Lijoi never wrote in either of the June 23, 2020 Facebook posts that racism does not exist and, therefore, Defendant Fontaine's statement: "Your messages deny that racism exists in our community and beyond" was made with knowledge that it was false.

119. Defendant Fontaine made the defamatory comment with an improper motive.

120. Defendant Fontaine made the defamatory comment with reckless disregard for its truth.

121. Defendant Fontaine made the defamatory comment with malice.

122. Defendant Fontaine's defamatory comment was published to others within the School District.

123. Defendant Fontaine's statement that Lijoi denied that racism exists in the Leicester community and beyond is incompatible with Lijoi's profession as a public school teacher and has caused severe damage to both his professional and personal reputations.

124. When Defendant Fontaine drafted the July 8, 2020 Notice of Intent to Dismiss letter, he was acting within the scope of his employment as Principal of the Leicester Middle School and, therefore, Defendants are vicariously liable for his actions.

WHEREFORE, Plaintiff has been harmed thereby.

## CLAIMS AGAINST DEFENDANTS CHRISTOPHER FONTAINE AND MARILYN TENCZA

### COUNT IV
### VIOLATION OF 42 U.S.C. § 1983
### FIRST AMENDMENT RETALIATION — TERMINATION

125. Plaintiff hereby incorporates by reference paragraphs 1-124 of this Complaint as though fully set forth herein.

126. At all relevant times to this matter, Lijoi was employed by a public employer.

127. On June 23, 2020, Lijoi made two Facebook posts concerning matters of a public concern — race and racism.

128. Lijoi made the June 23, 2020 Facebook posts as a private person outside of the workplace.

129. In his June 23, 2020 Facebook posts, Lijoi did not reference any matters pertaining to his workplace, supervisors or co-workers.

130. In his June 23, 2020 Facebook posts, Lijoi did not reference any matters pertaining to his position as a school teacher, the Leicester Public Schools or the Town of Leicester.

131. By making the June 23, 2020 Facebook posts, Lijoi was speaking as a citizen on matters of public concern.

132. No teachers who worked for the Leicester Public Schools ever complained to the School District about the June 23, 2020 Facebook posts.

133. No parents of any students in the Leicester Public Schools ever complained to the School District about the June 23, 2020 Facebook posts.

134. No students at the Leicester Middle School ever complained to the School District about the June 23, 2020 Facebook posts.

135. Because there were no complaints by any teachers, parents, or students about the June 23, 2020 Facebook posts in which Lijoi commented upon matters of public concern, the efficiency of the public services the Defendants Town of Leicester and Leicester Public Schools perform through its employees — providing educational instruction to public school students — was not disrupted in any way.

136. Accordingly, Lijoi's speech outweighed any interest that the Defendants Town of Leicester and Leicester Public Schools had in preventing unnecessary disruptions and inefficiencies in the workplace and, therefore, the School District did not have an adequate justification for terminating Lijoi.

137. Lijoi's June 23, 2020 Facebook posts are political speech protected under the First Amendment to the United States Constitution.

138. When Defendants terminated Lijoi, they were acting under the color of law within the meaning of 42 U.S.C. § 1983.

139. Lijoi's speech was a substantial or motivating factor in Defendants' decision to terminate him because Defendant Fontaine testified under oath that had Lijoi not made the June 23, 2020 Facebook posts, he would not have been terminated.

140. Prior to terminating Lijoi on August 18, 2020, Defendants were aware that the June 23, 2020 Facebook posts constituted protected speech under the First Amendment to the United States Constitution because Lijoi's union attorney specifically stated so on August 10, 2020 in a follow up letter to the July 28, 2020 *Loudermill* hearing where she wrote: "To terminate Mr. Lijoi would violate his rights under . . . the First Amendment to the United States Constitution."

141. Defendant Fontaine also testified at arbitration that prior to firing Lijoi on August 18, 2020, he was aware that Lijoi was claiming that the June 23, 2020 Facebook posts were protected speech under the First Amendment to the United States Constitution.

142. Defendants knew or reasonably should have known that Lijoi as a citizen possessed constitutionally-protected rights to be free from retaliatory treatment by them and Defendant Town of Leicester even if Lijoi vigorously exercised his right to free speech.

143. It was not objectively reasonable for Defendants to believe that they and Defendants Town of Leicester and Leicester Public Schools' unconstitutional, wrongful, tortious and negligent course of conduct concerning Lijoi was legally permissible in light of legal rules in existence at the time of the conduct.

144. It was not objectively reasonable for Defendants to believe that their actions were permissible under law.

145. Defendants are not entitled to immunity or qualified immunity regarding their unconstitutional, wrongful, tortious and negligent course of conduct concerning Lijoi complained of herein while acting under color of state law, because their conduct was clearly prohibited by federal law at the time, and it was clearly prohibited by reference to common standards of fairness, fair play and due process, and it was objectively and legally unreasonable in light of the legal rules clearly established at the time of the conduct.

146. Defendants stand personally liable to Lijoi pursuant to 42 U.S.C. § 1983 based upon their personal involvement and direct participation in the unconstitutional course of conduct concerning Lijoi complained of herein while acting under color of law and under pretense of law.

147. Defendants' conduct as described herein constitutes a violation of 42 U.S.C. § 1983.

148. The public interest has been harmed by the Defendants' unlawful actions against Lijoi.

    WHEREFORE, Plaintiff has been harmed thereby.

## COUNT V
## VIOLATION OF 42 U.S.C. § 1983
## FIRST AMENDMENT RETALIATION — JOB ELIMINATION

149. Plaintiff hereby incorporates by reference paragraphs 1-148 of this Complaint as though fully set forth herein.

150. On March 4, 2021 and March 24, 2021, arbitration hearings were held.

151. At arbitration, the School District presented no evidence that Lijoi had engaged in conduct unbecoming a teacher that could support a termination under the law.

152. The School District presented no evidence that any teachers, parents or students complained about the June 23, 2020 Facebook posts.

153. After the hearing were completed, it was clear and obvious that Lijoi would prevail on his arbitration claim and be reinstated to his position.

154. The arbitrator notified the parties that a decision would issue no later than June 21, 2021 (the "arbitration deadline").

155. Prior to the end of the academic school year in May 2021, but before the June 21, 2021 arbitration, the School District abruptly and without justification decided to eliminate Lijoi's position.

156. On August 3, 2021, six weeks after the arbitrator's decision, the School District notified Lijoi by letter that it had eliminated a middle school math teacher position at the end of the 2020-2021 academic school year and that based on his seniority, it did not have a math teacher position available for him at the middle school.

157. The August 3, 2021 letter also informed Lijoi that based on his seniority and bumping rights, it had no other teacher position available for him within the school district.

158. However, Matthew Joseph, the former Director of Curriculum and Instruction for the the School District, claims that Defendant Fontaine told him that he and Defendant Tencza made the decision to eliminate Lijoi's position "in case Joe Lijoi wins his arbitration. He would have bumping rights to whomever we put in that position if we don't cut one position."

159. Thus, it is clear that Lijoi's political speech was a substantial or motivating factor in Defendants' decision to eliminate his position.

160. Furthermore, Defendants are not protected by the doctrine of qualified immunity and, therefore, they are personally liable to Lijoi because Defendants violated a statutory or constitutional right, and the right was clearly established at the time of the challenged conduct.

    WHEREFORE, Plaintiff has been harmed thereby.

## COUNT VI
## INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP

161. Plaintiff hereby incorporates by reference paragraphs 1-160 of this Complaint as though fully set forth herein.

162. In May 2021, Lijoi had a business relationship or contemplated contract of economic benefit with the School District as he had recently completed an arbitration seeking reinstatement to his position as a 6th grade math teacher.

163. Defendants were aware of Lijoi's business relationship or contemplated contract of economic benefit with the School District.

164. Defendants interfered with Lijoi's business relationship or contemplated contract of economic benefit with School District by eliminating his position without justification for the sole purpose of ensuring that a potential reinstatement by the arbitration decision would not be feasible.

165. Defendants' interference with Lijoi's business relationship or contemplated contract of economic benefit with the School District was through improper motive or means because they did not approve of Lijoi's unpopular, political speech and, thus, wanted to punish him by taking away his livelihood.

166. As a direct result of Defendants' conduct, Lijoi lost an advantageous business relationship with the School District when his position was eliminated, thereby suffering severe economic losses.

    WHEREFORE, Plaintiff has been harmed thereby.

## CLAIMS AGAINST DEFENDANT CHRISTOPHER FONTAINE

### COUNT VII
### DEFAMATION

167. Plaintiff hereby incorporates by reference paragraphs 1-166 of this Complaint as though fully set forth herein.

168. On July 8, 2020, Defendant Fontaine issued to Lijoi a Notice of Intent to Dismiss letter in which he accused Lijoi of denying that racism exists in the Leicester community and beyond.

169. Importantly, Lijoi never wrote in either of the June 23, 2020 Facebook posts that racism does not exist and, therefore, Fontaine's statement: "Your messages deny that racism exists in our community and beyond" was made with knowledge that it was false.

170. Defendant Fontaine made the defamatory comment with an improper motive.

171. Defendant Fontaine made the defamatory comment with reckless disregard for its truth.

172. Defendant Fontaine made the defamatory comment with malice.

173. Defendant Fontaine's defamatory comments were published to others within the School District.

174. Defendant Fontaine's statement that Lijoi denied that racism exists in the Leicester community and beyond is incompatible with his profession as a public-school teacher and has caused severe damage to both his professional and personal reputations.

WHEREFORE, Plaintiff has been harmed thereby.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Honorable Court grant the following relief:

1. An order directing Defendants Town of Leicester and Leicester Public Schools to place Lijoi in the position Lijoi would have occupied but for Defendants' unlawful treatment of Lijoi, and make Lijoi whole for all earnings and benefits Lijoi would have received but for Defendants' unlawful treatment, including, but not limited to, wages, employment benefits, including an order requiring that Defendant reinstate Lijoi to an appropriate position without further violation of his rights or retaliation;

2. An award of compensatory damages for personal emotional pain, personal suffering, personal inconvenience and discomfort, mental anguish, extreme and severe emotional distress, loss of enjoyment of life, humiliation, embarrassment, fear and discomfort triggered by suffering a damage to his reputation, anguish, frustration, and other severe non-pecuniary losses, now, and in the future, as well as future pecuniary losses.

3. An order directing the Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful labor practices are eliminated and do not continue to affect Lijoi's employment opportunities;

4. A finding that the Defendants stand liable to Lijoi for an award of his reasonable attorneys' fees, litigation costs and other costs of this action, together with a post-trial hearing to determine the amount of Lijoi's reasonable attorneys' fees taxable to the Defendants, along with a determination of Lijoi's litigation costs and expenses taxable to the Defendants;

5. A finding that the doctrine of qualified immunity is inapplicable to Defendants Fontaine and Tencza and that they are personally liable to Lijoi;

6. An award of punitive damages against Defendants Fontaine and Tencza;

7. An appropriate award of pre-judgment interest on all sums recovered; and

8. Such other and further relief as this Court deems just and proper.

## Demand for Jury Trial

Plaintiff claims trial by jury on all issues so triable.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this **11**th day of November, 2021.

/s/Joseph Lijoi
JOSEPH LIJOI

JOSEPH LIJOI
By His Attorney,

/s/Mark P. Gagliardi
Mark P. Gagliardi (MA BBO#657622)

LAW OFFICE OF MARK P. GAGLIARDI
201 Wayland Avenue, Suite 8
Providence, RI 02906
(401) 277-2030
(401) 487-6666 (cell)
(401) 277-2021 (fax)
mark@markgagliardilaw.net

Date: November 11, 2021